IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LOVE TERMINAL PARTNERS, L.P.,　§
et al.,　§
　§
　　　　　Plaintiffs,　§
　§　Civil Action No. 3:06-CV-1279-D
VS.　§
　§
THE CITY OF DALLAS, TEXAS,　§
et al.,　§
　§
　　　　　Defendants.　§

MEMORANDUM OPINION
AND ORDER

The court must decide whether plaintiffs have stated a federal antitrust claim arising from defendants' conduct preceding enactment of the Wright Amendment Reform Act of 2006 ("Reform Act"), Pub. L. No. 109-352, 120 Stat. 2011 (2006), and from conduct to be taken pursuant to the Reform Act, including demolition of a private passenger terminal at Dallas Love Field Airport ("Love Field") in which plaintiffs hold a leasehold interest. Concluding that plaintiffs have failed to state a claim, the court grants defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss plaintiffs' federal-law claims with prejudice. The court in its discretion dismisses their state-law claims without prejudice.

I

A

Plaintiffs Love Terminal Partners, L.P. ("LTP") and Virginia Aerospace, LLC ("Virginia Aerospace") sue defendants City of Dallas, Texas ("Dallas"), City of Fort Worth, Texas ("Fort Worth"),

American Airlines, Inc. ("American"), Southwest Airlines Co. ("Southwest"), and the Dallas Fort Worth International Airport Board ("DFW Board") under §§ 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. §§ 1 and 2, and Texas law, complaining of defendants' conduct preceding enactment of the Reform Act and of conduct to be taken pursuant to the Reform Act. LTP and Virginia Aerospace hold leasehold interests in land located at Love Field, on which a passenger terminal ("the LTP Terminal") is situated. They allege that defendants engaged in an illegal conspiracy to allocate markets between horizontal competitors——American and Southwest——ultimately resulting in a contractual commitment by Dallas to demolish the LTP Terminal, and enactment of the Reform Act.

According to plaintiffs' first amended complaint ("complaint"),[1] Dallas Fort Worth International Airport ("DFW Airport") was opened for commercial service in 1974. To promote air travel from DFW Airport, Dallas and Fort Worth agreed to control the number and availability of flights at their city-owned airports. Air service at Love Field——which is owned by Dallas——was curtailed.

---

[1]For the purposes of deciding defendants' motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

Love Field, located near the Dallas downtown business district, has two terminals for commercial passenger operations. Dallas owns and operates the Main Terminal, which consists of 26 gates, 19 of which are operational. Currently, Southwest operates 14 of the 21 gates that it leases, American leases three, and ExpressJet Airlines, Inc. ("ExpressJet") operates and leases two. Southwest services approximately 95% of the passenger traffic at Love Field. The other terminal——the LTP Terminal——has six gates, but none is currently being used by an airline.

In 1978 Congress enacted the Airline Deregulation Act of 1978. In 1979 Southwest announced plans to initiate interstate service from Love Field to New Orleans. U.S. House of Representatives Speaker Jim Wright sponsored an amendment to the International Air Transportation and Competition Act of 1979 that would have banned all interstate flights from Love Field. To secure passage in the Senate, a compromise——the "Wright Amendment"——was reached. Under the Wright Amendment, interstate flights from Love Field were restricted to four contiguous states (Louisiana, Arkansas, Oklahoma, and New Mexico) for planes with a capacity of more than 56 passengers. Congress enacted the Wright Amendment to protect the development of DFW Airport, later amending it twice to permit direct flights to a total of nine neighboring states ("Wright Perimeter States").

DFW Airport is now the third largest airport in the world in

terms of operations and the second largest measured by land mass. American services approximately 85% of the traffic at DFW Airport. The need for Wright Amendment protection of DFW Airport has weakened over time, and states and consumers expressed interest in facilitating more convenient, less expensive travel to and from Love Field. The Wright Amendment was challenged by various interests. In an era of airline deregulation, the law effectively restricted competition among airlines who desired to compete in the lucrative North Texas market.

The market for commercial airline services in North Texas is a series of sub-markets. Because the Wright Amendment restricts long-haul flights, American is the dominant carrier at DFW Airport and is able to charge above-market premiums for flights to and from DFW Airport. Southwest controls the majority of gates at Love Field and is able to charge premiums for short-haul flights to and from Love Field. Consequently, two separate monopolists have forced consumers to pay artificially inflated prices for commercial air travel to and from North Texas.

In 1997 Legend Airlines ("Legend") expressed interest in providing air service from Love Field. Congress had enacted the Shelby Amendment, which relaxed the Wright Amendment to allow unrestricted flights to and from Love Field via certain smaller commercial aircraft. In 1999 LTP constructed the LTP Terminal and licensed its use to Legend.

Fort Worth and American sought to enjoin enforcement of the Shelby Amendment, and they engaged in a multifaceted litigation strategy that delayed Legend from providing service from Love Field until 1999. Legend was thus deprived of needed capital, and it filed for bankruptcy in 2000. LTP and Virginia Aerospace resumed control of the LTP Terminal.

In 2006 LTP and Virginia Aerospace entered into negotiations with Pinnacle Airlines, Inc ("Pinnacle") to assign their leasehold interests in the LTP Terminal. The assignment would have introduced a new competitive airline to the Love Field market, increased competition by using a terminal that was not subject to control by Dallas, and introduced competition into markets monopolized by Southwest and Dallas. LTP, Virginia Aerospace, and Pinnacle were close to completing the transfer of plaintiffs' interests in the leases on the land and the LTP Terminal.

In 2005 bills were introduced in Congress seeking outright repeal or further modification of the Wright Amendment. Southwest organized a campaign in support of the repeal. In response, American lobbied for an outright prohibition on commercial air service from Love Field or, at a minimum, continuation of the Wright Amendment restrictions.

In early 2006, some members of Congress suggested that Dallas and Fort Worth jointly propose a solution to the Wright Amendment. In March 2006 Dallas and Fort Worth passed resolutions requesting

that Congress not act concerning the Wright Amendment until later that summer. Defendants had already begun conspiring, however, to divide the North Texas markets for commercial air passenger service. In August 2005 Southwest and Dallas secretly discussed destroying the LTP Terminal. The conspiracy proceeded in secret throughout 2005 and into February 2006. By early February 2006, defendants had agreed that the LTP Terminal should be destroyed to ensure the success of the scheme to divide the North Texas markets and to insulate Southwest from increased competition. After the March 2006 resolutions were adopted, defendants continued their negotiations through a series of closed-door discussions in which they finalized their plan to carve up the market for commercial air passenger service to and from North Texas.

After several months of secret negotiations, Dallas, Fort Worth, DFW Board, Southwest, and American issued in June 2006 a "Joint Statement among the City of Dallas, the City of Fort Worth, Southwest Airlines, American Airlines, and DFW International Airport to Resolve the 'Wright Amendment' Issues" ("Joint Statement"). A few weeks later, the Dallas City Council and the Fort Worth City Council authorized execution of a "Contract and Agreement Regarding the Wright Amendment" that was consistent with the terms of the Joint Statement. On July 11, 2006 defendants executed a "Contract Among the City of Dallas, the City of Fort Worth, Southwest Airlines Co., American Airlines, Inc., and DFW

International Airport Board Incorporating the Substance of the Terms of the June 15, 2006 Joint Statement Between the Parties to Resolve the 'Wright Amendment' Issues" ("Contract"). Under the Contract, defendants bound themselves to the terms of the Joint Statement, with certain modifications.

The arrangement is anticompetitive in limiting air carrier operations and consumer choices for air travelers in North Texas. It violates the federal antitrust laws by significantly reducing competition for airline services and eliminating competition by commercial terminal operators. Essentially, the anticompetitive deal was put together to eliminate competition and protect American and Southwest from competition against each other and other carriers, allowing them to preserve their dominant market shares and fare premiums.

The conspiracy explicitly divides the markets for flights to and from North Texas between American and Southwest, who are horizontal competitors. Southwest has agreed that it will not compete with American in providing domestic, non-stop, long-haul flights for another eight years, and will not do so at DFW Airport. Under the Contract, Southwest cannot enter DFW Airport without relinquishing one gate at Love Field for each one it operates at DFW Airport (up to a total of eight gates). And Southwest has agreed that, even if Congress repeals the Wright Amendment in fewer than eight years, it will not attempt long-haul flights from Love

Field until eight years have elapsed. American and Southwest have agreed to continue the restrictions of the Wright Amendment for eight more years, even if Congress repeals the Wright Amendment sooner.

American benefits because the restrictions of the Wright Amendment prevent competition from Southwest in the form of non-stop flights to states outside those permitted under the Wright Amendment. Southwest benefits through barriers to entry at Love Field. The Contract deters other low-cost carriers from flying from Love Field, thus effectively preserving Southwest's monopoly over passengers who prefer to fly from Love Field. American is simultaneously protected from low-cost entrants at Love Field who could compete with American's flights from DFW Airport. This is the result of contractual provisions that mandate permanent and substantial reductions in the number of gates at Love Field and an allocation of the remaining gates to incumbent carriers.

Under the conspiracy, the number of Love Field gates is reduced from 32 to 20, and no airline is permitted to sub-divide a gate. The 20 gates are allocated among Southwest, American, and ExpressJet. Southwest retains 16, American retains two, and ExpressJet retains two. The effect is to deter new entrants from entering the North Texas market by flying from Love Field. Additionally, Dallas has agreed to extend the leases on Southwest's and American's gates until 2028. Of the 12 gates to be eliminated,

six are located in the LTP Terminal.

To effect these constraints, it was necessary to eliminate the LTP Terminal, which none of the three airlines uses and neither Dallas nor Fort Worth controls. The LTP Terminal is to be dismantled or demolished. Under the Contract, all steps, including demolishing the LTP Terminal, will be taken to ensure that it is not used for passenger service. Dallas is contractually obligated to use its government powers for this purpose. Absent the conspiracy, the six gates at LTP Terminal would be available for immediate use to increase competition at Love Field. Pinnacle realized the value of the LTP Terminal and decided to make a substantial investment to compete with Southwest and American at Love Field.

Dallas and Fort Worth also agreed to oppose efforts to initiate passenger service at any local airport except DFW Airport, and Dallas Mayor Laura Miller ("Mayor Miller") stated that new carriers were not welcome at Love Field or elsewhere. Under the Contract, and until 2025, if American or Southwest opens a gate within 80 miles of Love Field, it must relinquish one gate at Love Field for each new gate opened, up to a total of eight gates for Southwest and one and one-half gates for American. If another carrier does not take a forfeited gate, American can take a Southwest gate, and vice versa. This reduces the prospect that third parties will enter the local market.

With the elimination of the LTP Terminal, Southwest will have a stranglehold on short-haul flights until 2028. American is benefited because it can charge premium prices for long-haul flights for another eight years, and it is protected during this period against competition from long-haul flights in and out of Love Field. Dallas benefits from the scheme because its proprietary interests in an inferior terminal are protected, and eliminating LTP and Virginia Aerospace as gate competitors enables Dallas to charge monopoly premiums for its Main Terminal at Love Field.

In June 2006, on learning of the proposed transaction with Pinnacle and before the Dallas City Council had met publicly on this issue, Mayor Miller announced that any purchaser of the leasehold should be aware that Dallas did not intend for the facility to be used in the future for airplanes. Mayor Miller was acting in furtherance of defendants' agreement and from fear that the proposed transaction would disrupt the parties' backroom deal. In response, Pinnacle informed LTP and Virginia Aerospace that it was terminating negotiations on the deal.

In September 2006 the United States Senate and United States House of Representatives passed Senate Bill S. 3661, 109th Cong. (2006). In October 2006 the President signed the Reform Act into law. The Reform Act explicitly incorporates many of the Contract's provisions.

Among other pertinent provisions, the Reform Act allows immediate through service and ticketing to or from Love Field to all 50 states or any foreign destination, provided one stop is made in Texas, New Mexico, Oklahoma, Kansas, Arkansas, Louisiana, Mississippi, Missouri, or Alabama. It provides that the Wright Amendment is repealed eight years after the date of enactment of the Reform Act. The Reform Act also mandates that, as soon as practicable, Dallas shall reduce to 20 the number of gates available for passenger air service at Love Field, and it establishes this as the maximum number of gates. It also confers on Dallas the authority to "determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006." Reform Act § 5(a).

B

Plaintiffs allege in count one of their complaint that defendants are liable under § 1 of the Sherman Act for entering into an illegal contract and/or combination and/or conspiracy in restraint of trade. They assert in count two that defendants are liable under § 2 of the Sherman Act for conspiring to monopolize trade over the market for short-haul flights to and from North Texas. In count three, plaintiffs aver that defendants unlawfully conspired to monopolize trade over the market for long-haul

flights, in violation of § 2.  And plaintiffs allege in count four that defendants violated § 2 by unlawfully conspiring to monopolize trade over the market for gates at Love Field.[2]

Defendants move to dismiss plaintiffs' federal antitrust claims under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[3]  They maintain, in relevant part, that their conduct that preceded enactment of the Reform Act is protected under the *Noerr-Pennington* doctrine; that their actions taken after enactment of the Reform Act, including performance of the obligations prescribed by the Contract, are protected because the Reform Act compels them; and that plaintiffs lack standing to assert antitrust claims because, *inter alia*, they have not sufficiently alleged that they sustained an "antitrust injury."[4]

---

[2]LTP and Virginia Aerospace assert claims under Texas law for tortious interference with a prospective business relationship, civil conspiracy, and aiding and abetting.  As explained below, the court in its discretion dismisses these claims without prejudice.

[3]After defendants filed the instant motion to dismiss, they filed on April 20, 2007 a supplemental motion to dismiss arguing that plaintiffs' claims are barred by collateral estoppel based on a state court decision rendered in February 2007.  In view of the court's decision today, it need not decide whether plaintiffs' claims are barred by collateral estoppel.  Accordingly, defendants' supplemental motion to dismiss is denied without prejudice as moot.

[4]Defendants also contend that plaintiffs' antitrust claims are barred under the state-action doctrine, and that antitrust damages are precluded under the Local Government Antitrust Act of 1984, 15 U.S.C. §§ 34-36(a).  The court need not address these arguments.

## II

In deciding defendants' motion, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007)). "'Factual allegations must be enough to raise a right to relief above the speculative level[.]'" *Id.* (quoting *Bell Atl.*, 127 S. Ct. at 1965). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl.*, 127 S. Ct. at 1964-65 (citations, quotation marks, and brackets omitted).

## III

Defendants contend that plaintiffs cannot state an antitrust-law claim based on defendants' actions undertaken before the enactment of the Reform Act because this conduct is protected under the *Noerr-Pennington* doctrine.

A

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and United *Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), the Supreme Court established that "[t]he federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379-80 (1991). "The essence of the [*Noerr-Pennington*] doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988). "The point of the *Noerr-Pennington* doctrine is to protect private parties when they petition the government for laws or interpretations of its existing laws even though those private parties are pursuing their goals with anticompetitive intent." *Id.* at 1083; *see Pennington*, 381 U.S. at 670 ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.")

*Noerr-Pennington* immunity also applies when private parties conspire with government officials to achieve the desired anticompetitive result. *Omni*, 499 U.S. at 382-83. The Supreme Court has expressly refused to recognize an exception that would

apply "when government officials conspire with a private party to employ government action as a means of stifling competition." *Id.* at 382. Accordingly, under *Noerr-Pennington*, any activities directed toward lobbying the government for legislative action are immune[5] from antitrust liability, even if the involved parties conspire together to achieve an anticompetitive goal. *Id.* at 383.

B

Defendants maintain that because plaintiffs fail in their complaint to plead any anticompetitive conduct that allegedly occurred before enactment of the Reform Act that is distinct from defendants' successful efforts to lobby Congress, plaintiffs' antitrust claims based on pre-Reform Act conduct must be dismissed based on *Noerr-Pennington*. Plaintiffs respond that *Noerr-Pennington* is an affirmative defense that generally cannot be decided in the context of a Rule 12(b)(6) motion, because the defense typically does not appear on the face of the complaint. They also maintain that defendants are not entitled to *Noerr-Pennington* immunity because their conduct before the passage of the Reform Act extended beyond mere petitioning. Plaintiffs posit that defendants held secret meetings throughout 2005 and 2006 to

---

[5]Although courts generally refer to *Noerr-Pennington* "immunity," the Fifth Circuit has held that *Noer-Pennington* immunity from *liability* is an affirmative defense because it does not provide defendants complete immunity *from suit*. *See Bayou Fleet Inc. v. Alexander*, 234 F.3d 852, 860 (5th Cir. 2000); *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 290 (5th Cir. 2000).

formulate a joint plan to divide the markets for commercial airline passenger services; Mayor Miller's statement that the LTP Terminal would never be open for business immediately affected the Dallas sub-market for commercial airline passenger services by driving Pinnacle away; Mayor Miller's statement, made prior to any petitioning conduct and directed at potential market entrants rather than at Congress, advanced defendants' conspiracy and therefore independently violated the federal antitrust laws; and the Joint Statement and Contract constituted an agreement among defendants to bind themselves, not through legislation, but solely by contract, to conditions that serve to divide markets and erect barriers to entry.  Plaintiffs contend that because the Joint Statement and Contract constituted agreements to restrain trade and not to petition the government, the documents are not protected under *Noerr-Pennington*.

C

"Although dismissal under Rule 12(b)(6) is ordinarily determined by whether the facts alleged in the complaint, if true, give rise to a cause of action, a claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings." *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986) (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982)); *see also Jones v. Bock*, ___ U.S. ___, 127 S. Ct. 910, 921 (2007) ("Whether

- 16 -

a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract."); *EPCO Carbon Dioxide Prods., Inc. v. J.P. Morgan Chase Bank, N.A.*, 467 F.3d 466, 470 (5th Cir. 2006) ("Although dismissal under rule 12(b)(6) may be appropriate based on a successful affirmative defense, that defense must appear on the face of the complaint."); *Kansa Reinsurance Co. v. Congressional Mtg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994) ("[W]hen a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate." (citing *Clark*, 794 F.2d at 970)). Courts have dismissed antitrust actions at the Rule 12(b)(6) stage based on *Noerr-Pennington*. *See, e.g., Boone v. Redevelopment Agency of City of San Jose,* 841 F.2d 886, 897 (9th Cir. 1988) (affirming dismissal of antitrust claims at Rule 12(b)(6) stage based on *Noerr-Pennington*); *Lamar County Elec. Coop. Ass'n v. Rayburn Country Elec. Coop., Inc.*, 330 F.Supp.2d 763, 767 (E.D. La. 2002) (granting Rule 12(b)(6) motion based on *Noerr-Pennington* defense); *Astoria Entm't, Inc. v. Edwards*, 159 F.Supp.2d 303, 325 (E.D. La. 2001) (same). Accordingly, to determine whether *Noerr-Pennington* immunity shields defendants from antitrust liability, the court must examine the face of the complaint and determine whether plaintiffs have pleaded facts that clearly establish that the

activities about which they complain were part of defendants'
efforts to petition Congress concerning the Wright Amendment.

D

To determine whether it is apparent from the face of
plaintiffs' complaint that defendants are entitled to *Noerr-
Pennington* immunity for their pre-Reform Act activities, the court
will consider separately the specific instances of conduct on which
plaintiffs rely. The court first assesses plaintiffs' allegations
related to the Joint Statement and Contract.

Based on the facts alleged in the complaint and the attached
exhibits, the court holds that defendants' conduct in forming the
Joint Statement and Contract was clearly a part of their efforts to
petition Congress to adopt what eventually became the Reform Act.
Thus a N*oerr-Pennington* defense appears on the face of plaintiffs'
complaint as to the defendants' Joint Statement and Contract.

Plaintiffs aver that in the summer of 2005, legislation was
introduced in Congress seeking outright repeal or further
modification of the Wright Amendment. Southwest responded by
organizing a "grass-roots" campaign to support the repeal.
American mobilized lobbyists to ensure that the Wright Amendment
restrictions continued. According to the complaint, in early 2006
some members of Congress suggested that Dallas and Fort Worth
jointly propose a local solution to the Wright Amendment problem.
In March 2006 both cities passed independent resolutions requesting

that Congress refrain from taking legislative action until the cities had time to reach this solution. After several months of secret negotiations, defendants announced on June 15, 2006 that they had signed the Joint Statement. Less than one month later, they signed the Contract.

The title of the Joint Statement reflects that the purpose of the agreement was "to resolve the 'Wright Amendment' issue." Joint Statement 1 (uppercase omitted in part).[6] In the first paragraph, defendants agreed "to seek the enactment of legislation to initially amend . . . the 'Wright Amendment' and ultimately seek its repeal[.]" *Id*. at ¶ 1. Defendants explicitly made the agreement contingent upon Congress' later adopting the terms of the Joint Statement. *Id*. at ¶ 7 ("This agreement is predicated upon the condition that Congress will enact legislation to implement the terms and spirit of this agreement."). Moreover, defendants provided that the agreement would be "null and void" if Congress did not enact legislation before December 31, 2006. *Id*. at ¶ 16. Defendants clearly identified the Joint Statement as the "local

_____

[6]In deciding defendants' Rule 12(b)(6) motion, the court can consider the text of the Joint Statement and the Contract because they are properly attached to the complaint, and both documents are matters of public record. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (citing *Travis v. Irby*, 326 F.3d 644, 648 (5th Cir. 2003); *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995) ("In ruling on Rule 12(b)(6) motions, district courts generally may rely only on the complaint and its proper attachments. They are permitted, however, to rely on matters of public record." (citations omitted))).

solution" urged upon them by some members of Congress. "The Parties hereby represent to the Congress of the United States, and to the Citizens of . . . Dallas-Fort Worth that they have approved of and support the proposed local solution." *Id.* at ¶ 14. The Joint Statement anticipated the July 11, 2006 Contract as the final agreement between the parties. *Id.* at ¶ 15.

The Joint statement enumerated several terms that the Reform Act explicitly adopted: immediate through-service from Love Field to all 50 states, complete repeal of the Wright Amendment after 8 years from legislative action, and a reduction in the number of available gates from 32 to 20. *Id.* at ¶¶ 1(a), 1(b), and 3. Defendants agreed to a specific allocation of the 20 gates among American, Southwest, and Continental Airlines, *id.* at ¶ 3 n.2, and to the extension of the American and Southwest Love Field leases to 2028, *id.* at ¶ 17. The Joint Statement also provided for the condemnation and demolition of the LTP Terminal.

> The City of Dallas agrees that it will . . . [acquire] . . . portions of the lease on the [LTP Terminal] up to and including condemnation, necessary to fulfill the obligations under this agreement. The City of Dallas further agrees to the demolition of the Legend gates immediately upon acquisition of the lease to ensure the facility can never again be used for passenger service.

*Id.* at ¶ 5.

Within a month of issuance of the Joint Statement, defendants signed the Contract, which adopted the substance of the Joint

Statement.    Like  the  Joint  Statement,  the  Contract's  title
indicated that its purpose was "to resolve the 'Wright Amendment'
issues."    Compl.  Exh.  I  (uppercase  omitted  in  part).    The
Contract's recitals reflect that certain congressional leaders had
encouraged Dallas and Fort Worth to present a local solution.  *Id.*
at 1 ("[C]ertain Congressional leaders informed the Cities . . .
that  it  would  be  preferable  for  the  Cities  to  present  a  local
solution for addressing airport issues . . . in the Dallas/Fort
Worth metropolitan area, prior to any further action being taken by
Congress . . . .").    The recitals also stated that, "in response to
various  pending  and  proposed  Congressional  actions  that  would
further affect, modify or repeal the Wright Amendment," Dallas and
Fort Worth had passed the March 2006 resolutions asking Congress to
allow  the  cities  to  develop  a  local  solution  and  "to  present  a
mutually agreed upon plan to the Congress for its consideration[.]"
*Id.*    The  recitals  also  referred  to  "a  series  of  meetings  with
interested parties" that had taken place earlier in the year "in an
effort to reach a local agreement regarding Love Field that would
end  the  prolonged  and  divisive  controversies  between  the  two
Cities." *Id.*  The Contract explicitly mentioned the meetings among
the cities, the DFW Board, American, and Southwest.

> [T]he  Mayors,  representatives  of  the  DFW
> Board,  and  other  governmental  officials  then
> met  separately  with  Southwest  Airlines  and
> American  Airlines  to  advise  those  airlines
> that  the  local  governments  would  announce  a
> local  solution  and  recommend  it  to  Congress

and that they wanted the airlines to consent
to, and endorse, the local solution.

*Id.* at 2. "[T]he Mayors and representatives of the DFW Board
thereafter conducted certain limited negotiations separately with
Southwest Airlines and American Airlines[.]" *Id.* "Southwest
Airlines and American Airlines concluded, separately, that the
local solution reached among, and urged upon them by, the local
governments would be favorably received by the Congress, and that
under the circumstances presented, the airlines should support the
effort of the Cities and the DFW Board and acquiesce in, and agree
to support, the local solution[.]" *Id.*

Article I of the Contract provided that defendants "agree to
seek the enactment of legislation to allow for the full
implementation of this Contract including, but not limited to,
amending . . . the 'Wright Amendment' and ultimately effect its
repeal[.]" *Id.* at art. I, ¶ 1. Like the Joint Statement, the
binding force of the Contract was conditioned on Congress' enacting
legislation before December 31, 2006 that incorporated the terms of
the Contract. *Id.* at art. I, ¶ 7. The parties again identified
the Contract with the local solution that they had been urged to
reach. "The Parties hereby represent to Congress of the United
States, and to the Citizens of the Dallas-Fort Worth area that they
approve of and support the local solution as set forth in this
Contract." *Id.* at art. I, ¶ 14.

As with the Joint Statement, the Contract contained many terms

that the Reform Act later explicitly adopted: immediate through-service from Love Field to all 50 states, provided a stop is made in a Wright Perimeter State; repeal of the Wright Amendment 8 years after enactment of legislation; and the permanent reduction of available Love Field gates from 32 to 20. *Id.* at art. I, ¶¶ 1(a), 1(b), and 3. Defendants gave greater definition to the division of the 20 gates among American, Southwest, and ExpressJet, *id.* at art. I, ¶ 3(b), and provided for the extension of the American and Southwest leases until 2028, *id.* at art. I, ¶ 17. As did the Joint Statement, the Contract required that the LTP Terminal be acquired and demolished.

> [Dallas] agrees that it will acquire all or a portion of the lease on the [LTP Terminal], up to and including condemnation . . . [and] further agrees to the demolition of the gates at the [LTP Terminal] immediately upon acquisition of the current lease to ensure that the facility can never again be used for passenger service.

*Id.* at art. I, ¶ 5.

Therefore, concerning defendants' conduct related to adoption of the Joint Statement and Contract, the protection afforded by *Noerr-Pennington* appears plainly on the face of plaintiffs' complaint, notwithstanding defendants' alleged anticompetitive motives and the anticompetitive effects of their conduct. The Joint Statement and Contract amply demonstrate that both agreements represent the culmination of defendants' efforts to petition Congress. Plaintiffs do not allege facts that state a plausible

claim that either agreement was negotiated or adopted for any purpose other than to effect the amendment and eventual repeal of the Wright Amendment.[7]

E

The court considers, second, whether defendants' discussions and meetings leading up to the Joint Statement and Contract are entitled to *Noerr-Pennington* immunity.

1

Plaintiffs allege that "[i]n early 2006, a few members of Congress suggested that the City Defendants jointly propose a solution to the Wright Amendment." Compl. ¶ 47. This assertion is corroborated by the contractual recital that states that certain congressional leaders urged the cities to develop a local solution. Similarly, both the complaint and the Contract confirm that, in

---

[7]Although there is a "sham" exception to *Noerr-Pennington* immunity, the complaint fails to allege facts that would support this exception. "The 'sham' exception to [*Noerr-Pennington*] encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Omni*, 499 U.S. at 380. "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so *through improper means*." *Id.* (citations and internal quotation marks omitted). "A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *Id.* (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)). That Congress amended the Wright Amendment and effected its ultimate repeal within the December 31, 2006 deadline, and explicitly incorporated many of the terms of the Joint Statement and Contract, strongly support the conclusion that defendants' efforts were not simply a sham.

response to such prompting, Dallas and Fort Worth adopted resolutions requesting that Congress allow them to negotiate a local solution. Plaintiffs allege, and the Contract corroborates, that in the process of negotiating a local solution that culminated in the Joint Statement and Contract, Dallas and Fort Worth conducted "a series of meetings with interested persons," including the DFW Board, American, and Southwest.

The complaint plainly demonstrates that defendants' meetings from early 2006 leading up to the Joint Statement and Contract are protected conduct under *Noerr-Pennington*. Even assuming that some meetings during this period were clandestine, this fact is simply immaterial for purposes of applying *Noerr-Pennington*. *See Omni*, 499 U.S. at 383-84. Thus a *Noerr-Pennington* defense that covers defendants' conduct from early 2006 until adoption of the Joint statement and Contract appears on the face of plaintiffs' complaint.

2

Although it is a closer question whether the complaint is sufficient to state a claim based on defendants' conduct that occurred before early 2006, the court concludes that dismissal is still warranted. Plaintiffs maintain that they rely on anticompetitive conduct that occurred long before the Reform Act was enacted. They aver that, even before the March 2006 resolutions adopted by Dallas and Fort Worth, defendants were

> conspiring to carve up the market for
> commercial air passenger service in the North
> Texas area for their benefit. Indeed, in
> August 2005, Southwest and the City of Dallas
> were already secretly discussing destroying
> the LTP Terminal. The conspiracy proceeded in
> secret throughout 2005 and into February 2006.
> Indeed, by early February 2006, Defendants had
> the parameters of their illegal combination in
> place. In particular, Defendants had agreed
> that the LTP Terminal should be destroyed, as
> this was essential to assure the success of
> their scheme to divide the North Texas markets
> and to insulate Southwest from increased
> competition.

Compl. ¶¶ 48-49. These paragraphs of the complaint are the only ones that specifically allege that defendants engaged in anticompetitive activity before the cities adopted the resolutions.

Even assuming that a *Noerr-Pennington* defense for defendants' conduct before early 2006 is not apparent from the face of the complaint, plaintiffs must still plead sufficient facts to support a plausible claim that such meetings and agreements actually occurred. In other words, even assuming that defendants' conduct is not shown from the face of the complaint to be immunized under *Noerr-Pennington*, plaintiffs may have failed to state antitrust claims on this basis.

Under the *Bell Atlantic* pleading standard, plaintiffs' reliance on bare labels and conclusory allegations to assert that defendants engaged in such a conspiracy during this period is insufficient to survive a Rule 12(b)(6) motion. Plaintiffs are obligated to plead facts that raise a right to relief beyond the

speculative level. Plaintiffs' attempt to plead that defendants unlawfully conspired before early 2006 is no more plausible, however, than the allegations of conspiracy dismissed in *Bell Atlantic*. This is because the allegations are nothing more than legal conclusions. As in *Bell Atlantic*, "the pleadings mention[ ] no specific time, place, or person involved in the alleged conspiracy." *Bell Atl.*, 127 S. Ct. at 1970-71 n.10. Thus the complaint fails to give proper notice under Rule 8 concerning a conspiracy that commenced before early 2006. *Id.*[8] Pleading a claim that is sufficient to withstand dismissal under Rule 12(b)(6) requires that plaintiffs go beyond "labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Id.* at 1965. "[A] naked assertion of conspiracy . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 1966 (internal

---

[8]The court is not imposing on plaintiffs the heightened pleading standard of Rule 9.

> On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires. Here, our concern is not that the allegations in the complaint were insufficiently particularized; rather the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.

*Bell Atl.*, 127 S.Ct. at 1973 n.14 (quotations, brackets, and citations omitted).

quotation marks and brackets omitted). Plaintiffs have failed to plead any factual enhancement to their legal conclusions concerning defendants' alleged participation in a conspiracy before the cities adopted the resolutions in March 2006. The court holds that concerning the period before early 2006, the complaint lacks "enough heft to show that [plaintiffs are] entitled to relief." *Id.*[9]

F

The court assesses, third, plaintiffs' claims to the extent based on Mayor Miller's June 2, 2006 statement.

Plaintiffs allege that, in March 2006, they entered into negotiations with Pinnacle "for the assignment of Plaintiffs' leasehold interest in the LTP Terminal," Compl. ¶ 44; that the deal, valued at approximately $100 million, would have brought a new airline to Love Field to compete with Southwest and American, *id.* at ¶¶ 44-45; and that, on June 2, 2006, they publicly announced that the deal was almost complete, *id.* at ¶ 45. Plaintiffs aver

---

[9]Although the *Bell Atlantic* pleading standard provides a sufficient ground for dismissing plaintiffs' claims with respect to defendants' conduct before early 2006, the only circumstantial facts that plaintiffs assert concerning this period suggest that, even if there was a pre-2006 conspiracy, the conduct was protected under *Noerr-Pennington*. Plaintiffs allege that "[i]n the summer of 2005, three bills were introduced in the United States Congress seeking outright repeal or further modification of the Wright Amendment. Southwest organized a 'grass roots' campaign to support the repeal." Compl. ¶ 46. Both allegations lend support to the conclusion that any agreements that were made from August 2005 until early 2006 were protected petitioning efforts.

that in response to the contemplated transaction, Mayor Miller made a public statement that effectively scuttled the Pinnacle deal.

> Upon learning that Plaintiffs were about to enter the transaction with Pinnacle, and afraid that the anticipated transaction would disrupt Defendants' back room deal, on June 2, 2006, on behalf of Defendants, and in furtherance of their agreement, Dallas Mayor Laura Miller ("Miller"), without the right, authority, or justification for doing so, announced publicly that she "want[ed] to make sure any prospective buyers of that leasehold are aware the City of Dallas does not intend for that to be used for airplanes in the future."

Compl. ¶ 69 (quoting Emily Ramshaw & Suzanne Marta, *Legend's ghost haunts Love*, *Dallas Morning News* (June 3, 2006)). According to the complaint, Mayor Miller made this statement before any public meeting was convened on the issue, and she continued to assert that it was defendants' plan to demolish the LTP Terminal. Consequently, Pinnacle terminated its negotiations with plaintiffs.

The court concludes that plaintiffs' antitrust claims based on Mayor Miller's statement must be dismissed. First, a *Noerr-Pennington* defense is apparent from the face of plaintiffs' complaint. In the sentence in which the complaint identifies Mayor Miller's anticompetitive statement, it also describes the purpose for which she made the statement: her fear that plaintiffs' deal with Pinnacle would derail a local resolution of the Wright Amendment problem. Plaintiffs acknowledge that the ultimate purpose of Mayor Miller's statement concerning demolition of the

LTP Terminal was to aid in negotiating a local solution. The court has already concluded that the local solution, as manifested in the Joint Statement and Contract, was part of defendants' protected efforts to petition Congress.[10]

Second, plaintiffs' antitrust claims based on Mayor Miller's statement must be dismissed based on the absence of an alleged antitrust injury. "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 n.14 (1972)). The fact that a plaintiff has proved an antitrust violation and a causal link between that violation and the plaintiff's injury is insufficient to establish an antitrust injury. *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 486-89 (1977). The plaintiff's injury must be the type of harm that "the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should

_____

[10]That the statement may have been unwarranted and may have caused incidental anticompetitive effects does not support a sham exception to defendants' *Noerr-Pennington* defense. As noted *supra* at note 7, a sham situation involves a defendant whose activities are not genuinely aimed at procuring favorable governmental action rather than at one who genuinely seeks to achieve his governmental result, but does so through improper means. Even assuming that Mayor Miller's comments were wrongful and without authority, the complaint demonstrates on its face that the comments were part of defendants' petitioning efforts and therefore protected under *Noerr-Pennington*.

reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* at 489; *see also Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 346 (5th Cir. 2002) (dismissing plaintiff's antitrust claim because defendant's conduct, although harmful to plaintiff, did not eliminate plaintiff as competitor).

Assuming that Mayor Miller's statement is not protected under *Noerr-Pennington* and that it violated federal antitrust law, plaintiffs have failed to plead adequately that the statement caused them antitrust injury. The injury that plaintiffs assert in their complaint flows from defendants' agreement to demolish the LTP Terminal and to divide up the airline market to protect Southwest's monopoly over short-haul flights at Love Field. As potential competitors in the airline market,[11] competitors in the airline gate market,[12] and consumers of airline tickets,[13] plaintiffs

---

[11]At least at the pleading stage, plaintiffs have established antitrust standing based on their intent and preparedness to enter the airline market. *See* Compl. ¶ 17. "There are numerous decisions stating that one need not have an actual going business to obtain standing, but an attempt to enter a business is sufficient." *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633 (5th Cir. 1966). "However, these decisions lay down two significant requirements. First, there must be the intention to enter the business; and second, there must be a showing of preparedness to enter the business." *Id.* Plaintiffs have adequately alleged that they intend to enter the airline market and that they are prepared to do so.

[12]"Restraint in the market affects consumers and competitors in the market; as such they are the parties that have standing to sue." *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1183 (5th Cir. 1988). Defendants do not deny that plaintiffs are competitors in the

possess antitrust standing.   As potential competitors in the airline industry and as gate competitors, plaintiffs face a loss of profits that they would have earned absent the agreement to demolish the LTP Terminal and divide up the airline market.   As consumers of airline tickets, plaintiffs are subject to the injury of artificially inflated prices for flights in the North Texas region.   None of these antitrust injuries, however, stems from Mayor Miller's statement.   Even assuming that the statement was the product of an agreement rather than a unilateral action, it could not of itself have deprived plaintiffs of future profits, nor could it alone have artificially inflated the price of airline tickets in the North Texas region.   The only potential harm flowing from the statement is that plaintiffs were deprived of a lucrative lease assignment with Pinnacle.   If the lease assignment deal had been consummated, however, plaintiffs would have left the market (both the gate market and as potential competitors in the airline market).   Although plaintiffs may have been harmed by Mayor Miller's statement, it is not the kind of harm that the antitrust laws intend to protect.   Plaintiffs have not cited any authority suggesting that the antitrust laws protect those who seek to leave

---

airline gate market.   Rather, they maintain that plaintiffs cannot challenge Dallas' use of eminent domain proceedings.

[13]Plaintiffs allege that they are consumers of airline tickets for flights out of Love Field and DFW, Compl. ¶ 17, and that defendants' conspiracy has artificially inflated ticket prices, *id.* at ¶¶ 57 and 68.

a market.  If the statement caused any antitrust injury at all, it injured Pinnacle as a company who would have been a market competitor had the lease assignment been consummated.  Nor do plaintiffs allege that, after Mayor Miller made the statement, they were subjected to higher ticket prices as purchasers of airline tickets for flights in the North Texas region.

As plaintiffs have pleaded their case, the harm to them as potential airline competitors and as consumers stems from defendants' agreement to demolish the LTP Terminal and to secure Southwest's dominance at Love Field.  Even if Mayor Miller's statement independently injured plaintiffs' ability to compete as airline gate competitors (by preventing them from attracting potential airline customers who would be willing to commit to use the LTP Terminal under tenuous circumstances), the publication of the Joint Statement prevents plaintiffs from establishing antitrust injury as gate competitors on the basis of Mayor Miller's statement alone.  The Joint Statement was issued on June 15, 2006, only three days after plaintiffs received notice on June 12, 2006 from Pinnacle about the failed lease assignment deal.  The court has already concluded that the Joint Statement constitutes protected conduct under *Noerr-Pennington*.  Significantly, the Joint Statement reflected the consensus of the parties to the local solution that Mayor Miller had correctly stated on June 2, 2006 that the LTP Terminal would be demolished.  Thus there were only three days

(i.e., June 12 to June 15) in which Mayor Miller's statement could have caused the plaintiffs antitrust injury as gate competitors, because the protected Joint Statement effectively superseded Mayor Miller's statement as the cause of plaintiffs' inability to secure an airline customer for their gates. Plaintiffs do not allege any failed attempts to land a potential airline customer during this three-day period. Regarding plaintiffs' status as airline gate competitors, the court holds that they have failed to plead that they suffered an antitrust injury caused by Mayor Miller's statement. Consequently, all of plaintiffs' claims based on Mayor Miller's statement are subject to dismissal.

G

Accordingly, for the reasons explained, the court grants defendants' motion to dismiss plaintiffs' antitrust-law claims to the extent based on alleged pre-Reform Act conduct.

IV

The court now considers whether plaintiffs have stated a claim on which relief can be granted based on defendants' post-Reform Act conduct. The dispositive question presented is whether the Reform Act compels defendants to implement the terms of the Contract and thus immunizes them from antitrust liability.

A

Section 5(a) of the Reform Act provides:

> The city of Dallas, Texas, shall reduce as
> soon as practicable, the number of gates
> available for passenger air service at Love
> Field to no more than 20 gates.  Thereafter,
> the number of gates available for such service
> shall not exceed a maximum of 20 gates.  The
> city of Dallas, pursuant to its authority to
> operate and regulate the airport as granted
> under chapter 22 of the Texas Transportation
> Code and this Act, shall determine the
> allocation of leased gates and manage Love
> Field in accordance with contractual rights
> and obligations existing as of the effective
> date of this Act for certificated air carriers
> providing scheduled passenger service at Love
> Field on July 11, 2006.  To accommodate new
> entrant air carriers, the city of Dallas shall
> honor the scarce resource provision of the
> existing Love Field leases.

Reform Act § 5(a).

Defendants maintain that the Reform Act's reference to the
"rights and obligations existing as of the effective day of this
Act for certificated air carriers providing scheduled passenger
service at Love Field on July 11, 2006" manifests Congress' intent
to incorporate all of the Contract's terms, including demolition of
the LTP Terminal and the Contract's specific allocation of Love
Field gates.  Plaintiffs respond, first, that because the Contract
violated the federal antitrust laws *ab initio*, it was void and no
rights or obligations existed under it on October 16, 2006, the
effective date of the Reform Act.  Thus the Reform Act does not
compel defendants to implement the Contract.  Plaintiffs posit,

second, that although the Reform Act does adopt some of the Contract's terms (e.g., reducing the gates at Love Field from 32 to 20), the statute's plain meaning does not require performance of the entire agreement. They maintain that the Reform Act, for instance, does not directly mandate a number of anticompetitive actions specifically compelled by the Contract: demolition of the LTP Terminal, extension of the Southwest and American Love Field leases until 2028, and allocation of 16 gates to Southwest. Plaintiffs contend that because the Reform Act does not explicitly give effect to these contractual terms, the court should construe the Reform Act as not requiring them.

B

Because the court holds that the Contract is immune from antitrust liability under *Noerr-Pennington*, it rejects plaintiffs' contention that the Contract violated the federal antitrust laws, it was therefore void, and no rights or obligations existed under it on the effective date of the Reform Act.

C

The court next considers plaintiffs' contention that the Reform Act does not compel defendants to carry out acts that plaintiffs complain violate the antitrust laws.

1

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning

- 36 -

with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). The court's "inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.* (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992)). "Unless exceptional circumstances dictate otherwise, '[w]hen [the court] find[s] the terms of a statute unambiguous, judicial inquiry is complete.'" *Burlington N. R.R. Co. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).[14] "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341 (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991)).

Plaintiffs maintain that, under the doctrine of last antecedent, the phrase in § 5(a), "in accordance with contractual rights and obligations," modifies only Dallas' duty to "manage Love

---

[14]Although "[l]egislative history can be a legitimate guide to a statutory purpose obscured by ambiguity . . . [i]n the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive." *Burlington*, 481 U.S. at 461 (quotation marks and citations omitted). Because the court concludes that the Reform Act's meaning is clear on its face, it need not address the parties' arguments concerning the Reform Act's legislative history.

Field," not Dallas' obligation to "determine the allocation of leased gates." The doctrine of last antecedent provides that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Under plaintiffs' reading of § 5(a), Dallas' statutory obligation to "determine the allocation of leased gates" at Love Field is not governed by the rights and obligations specified in the Contract.

2

The court holds that the Reform Act plainly and unambiguously incorporates all the rights and obligations of the Contract. The court therefore rejects plaintiffs' attempt to avoid the Act's clear statutory intent by relying on the doctrine of last antecedent, which "is hardly a mandatory rule of statutory construction," *In re Paschen*, 296 F.3d 1203, 1209 n.4 (11th Cir. 2002), "can assuredly be overcome by other indicia of meaning," *Barnhart*, 540 U.S. at 26, and "is not applied where the context indicates otherwise," *United States v. Pritchett*, 470 F.2d 455, 459 (D.C. Cir. 1972).

In relevant part, § 5(a) of the Act directs Dallas to "determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11,

2006." Reform Act § 5(a). This provision manifests Congress'
intent to incorporate into the Reform Act the terms of the Contract
executed on July 11, 2006. The statute refers without
qualification to Dallas' obligation to act in accordance "with
contractual rights and obligations existing as of the effective
date of this Act for certificated air carriers providing scheduled
passenger service at Love Field on July 11, 2006." The
"contractual rights and obligations" that existed "as of the
effective date of" the Reform Act are those included in the
Contract.

Section 5(a) is not the only section that manifests
congressional intent to give effect to the entire Contract. When
interpreting the Reform Act, the court must consider it as a whole.
*United States v. Atl. Research Corp.*, ___ U.S. ___, 127 S. Ct.
2331, 2336 (2007) ("Statutes must 'be read as a whole.'" (quoting
*King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991))); *Koons
Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) ("Statutory
construction is a holistic endeavor. A provision that may seem
ambiguous in isolation is often clarified by the remainder of the
statutory scheme[.]" (internal quotations omitted)); *Household
Credit Servs. Inc. v. MBNA Am. Bank N.A.*, 541 U.S. 232, 239 (2004)
("[I]n ascertaining the plain meaning of the statute, the court
must look to the particular statutory language at issue, as well as
the language and design of the statute as a whole." (internal

quotations omitted)). Section 5(b) states that "[n]o Federal funds or passenger facility charges may be used to remove gates at the Lemmon Avenue facility, Love Field, in reducing the number of gates as required under this Act[.]" Reform Act § 5(b).[15] There would be no need for this provision unless the Reform Act incorporated the terms of the Contract, which mandates a reduction of the number of Love Field gates from 32 to 20, contains exacting details concerning how Love Field gates will be allocated, and obligates Dallas to acquire all or a portion of the lease on the LTP Terminal and to demolish the gates at the LTP Terminal.

Moreover, another provision of the Reform Act states:

> [T]he Federal Aviation Administrator may not make findings or determinations, issue orders or rules, withhold airport improvement grants or approvals thereof, deny passenger facility charge applications, or take any other actions, either self-initiated or on behalf of third parties——
> (A) that are inconsistent with the contract dated July 11, 2006, entered into by the city of Dallas, the city of Fort Worth, the DFW International Airport Board, and others regarding the resolution of the Wright amendment issues[.]

*Id.* § 5(d)(1). The Reform Act's directive to the Federal Aviation Administrator not to frustrate performance of the Contract also evidences congressional intent to incorporate the Contract as a whole. Considering the statute as a whole, the court concludes

---

[15]The parties agree that the Lemmon Avenue facility is the LTP Terminal.

that the Reform Act unambiguously incorporates the entire Contract.

Accordingly, the court holds that the Reform Act compels defendants to implement the terms of the Contract.[16]

D

The court next considers how the Reform Act's incorporation of the Contract's terms affects plaintiffs' federal antitrust claims.

"[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974); *see also United States v. Borden Co.*, 308 U.S. 188, 198 (1939) ("When there are two acts upon the same subject, the rule is to give effect to both if possible."). Furthermore, "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton*, 417 U.S. at 550-51 (citing *Bulova Watch Co. v. United States*, 365 U.S. 753, 758

---

[16]Plaintiffs contend that construing the Reform Act to incorporate the Contract raises constitutional problems under *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997). They maintain that the Reform Act would unconstitutionally commandeer Dallas to exercise its eminent domain powers, in violation of the Tenth Amendment. The court disagrees. The Reform Act does not compel Dallas to enact and enforce a federal regulatory program. *See Printz*, 521 U.S. at 925-933; *New York*, 505 U.S. at 160-166. As distinguished from *Printz* and *New York*, the local governments in the present case whose conduct is regulated by the Reform Act voluntarily sought Congress' statutory endorsement of their local agreement. Therefore, construing the Reform Act to incorporate the Contract does not raise constitutional problems.

(1961); *Rodgers v. United States*, 185 U.S. 83, 87-89 (1902)).

The Sherman Act broadly prohibits contracts, combinations, or conspiracies in restraint of trade. 15 U.S.C. § 1. By reducing the flight output at Love Field through a 20-gate restriction, allocating the gates at Love Field to uphold Southwest's dominance over the short-haul market, and requiring that the LTP Terminal be demolished, the Reform Act almost undoubtedly conflicts with the Sherman Act. But the Sherman Act and the Reform Act are capable of coexistence. Considered together, it is clear that Congress intends as the default rule that anticompetitive conduct be broadly prohibited by law. But in the case of airline competition in the North Texas region, Congress is willing to tolerate and sanction some anticompetitive behavior as a means of effecting the eventual end to the Wright Amendment restrictions that hamstring domestic flights to and from Love Field.

Because both the Sherman Act and the Reform Act can coexist, the court concludes that antitrust liability cannot attach to defendants' actions that are compelled by the Reform Act, including by the Contract that the Reform Act incorporates. Congress would not have endorsed the Contract and then have subjected defendants to antitrust liability for acting under its aegis. *See Alpha Lyracom Space Commc'ns, Inc. v. Commc'ns Satellite Corp.*, 946 F.2d 168, 174 (2d Cir. 1991) ("Congress could not have intended to require [a private party] to [act] subject to [federal government]

directives and, at the same time, have intended that [it] proceed at its own antitrust peril in carrying out that official role."). The court therefore grants defendants' motion to dismiss all of plaintiffs' antitrust claims based on post-Reform Act conduct.

V

Plaintiffs also assert state-law claims for tortious interference with prospective business relationship, civil conspiracy, and aiding and abetting. Having dismissed plaintiffs' federal-law claims, the court in its discretion declines to exercise supplemental jurisdiction over their state-law claims.

Although this court may exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a), "when all federal claims are dismissed or otherwise eliminated from a case prior to trial, [the Fifth Circuit has] stated that [its] 'general rule' is to decline to exercise jurisdiction over the pendent state law claims." *McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998) (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989)), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433, 440 (5th Cir. 2003) (en banc). Defendants acknowledged during oral argument that the state-law claims are subject to dismissal once the federal antitrust claims are dismissed. Accordingly, the court dismisses plaintiffs' state-law claims without prejudice.

*     *     *

Defendants' January 23, 2007 amended joint motion to dismiss plaintiffs' first amended complaint is granted, and this action is dismissed in part with prejudice and in part without prejudice by judgment filed today. Defendants' April 20, 2007 supplemental motion to dismiss plaintiffs' first amended complaint is denied without prejudice as moot.

**SO ORDERED.**

October 31, 2007.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE